**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| HULON VERSER, K64085 | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:23-cv-16784 |
| | ) | |
| v. | ) | Judge Sharon Johnson Coleman |
| | ) | |
| RYAN WOODS, Warden, | ) | |
| Sheridan Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Petitioner Hulon Verser ("Petitioner") brings his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner asks the Court to vacate his 1998 convictions for the aggravated kidnappings and first-degree murders of fifteen-year-old Stanton Burch ("Burch") and eighteen-year-old Michael Purham ("Purham") for which Petitioner is currently serving a life sentence. For the reasons stated herein, the Court denies his petition on the merits, with prejudice.

**Background**

Unless otherwise noted, the following facts are drawn from the state appellate court opinion affirming Petitioner's convictions and the state appellate court opinion dismissing Petitioner's postconviction petition following a third-stage evidentiary hearing. *People v. Verser,* No. 1-19-2224 (Ill. App. Ct. Sept. 21, 2022). *See Thompkins v. Pfister*, 698 F.3d 976, 983 (7th Cir. 2012) ("[t]he state court's factual determinations are entitled to a presumption of correctness.").

**A. Initial Arrest**

Officer Mike Cronin ("Officer Cronin"), a Chicago gang specialist, investigated a power struggle between two factions of the Unknown Vice Lords, a Chicago-based gang, throughout 1993. One faction, led by Tyrone Williams, or "Baby Ty," included a member named Artez Thigpen, or "Ted." The rival faction was led by a man named Willie Lloyd. On September 14, 1993, Officer

1

Cronin received information from a reliable informant that Baby Ty would attend a funeral of a gang member at Branch Funeral Home, located at Roosevelt Road and Kedzie Avenue. The informant also suggested Willie Lloyd would attend the funeral. Based on this information, Officer Cronin installed surveillance footage outside of the funeral home.

Around 8:00 pm on September 14, 1993, the footage captured 15 individuals, including Baby Ty, walking towards the funeral home in hooded sweatshirts. The individuals exited the funeral home a few minutes later and walked to a car parked on Roosevelt Road. A few individuals entered the parked car while others walked to and entered another vehicle, a two-door gray Oldsmobile parked at 1158 South Troy Street. The remaining individuals walked towards and entered a van parked in front of the Oldsmobile. After the individuals entered the cars, police units began to follow the vehicles. Officer James Norris ("Officer Norris") followed the van, while gang specialists Robert Schaeffer ("Officer Schaeffer") and Sergeant Branagan ("Sergeant Branagan") followed the Oldsmobile. After Officer Norris stopped the Oldsmobile, he saw a man in a dark hooded sweatshirt running in his direction. Officer Norris ordered the man to stop, but the man continued running past Officer Norris, crossed the street, and then hid behind a dumpster. Officer Norris followed the man, and after a search, found a .9-millimeter automatic handgun in the man's waistband with the terms "Vice Lords" scratched into the wooden handle of the gun. Officer Norris arrested the man, who was later identified as Petitioner.

### B. Police Interview

Around 1:30 a.m. on September 15, 1993, the arresting officers transported Petitioner to the Area 4 police station for questioning by Detective Christin Kato ("Detective Kato"). At the time, officers in the station, including Detective Kato and his partner, were investigating the disappearances and murders of Burch and Purham and believed Petitioner could provide additional information. Detective Kato advised Petitioner of his rights and began questioning him about Burch and Parnham.

Around 4:00 am, a Felony Review Assistant, James Nelson, ("ASA Nelson"), arrived to continue the questioning. After this questioning, Petitioner gave a hand-written statement detailing the disappearances and murders of Burch and Purham. The statement indicated it was taken "regarding the fatal shooting of Stanton Burch and Michael Purham which occurred September 13, 1993, at 2501 West Roosevelt at 2:00 p.m." In the statement, Petitioner admitted the following:

1) he was a member of the Uknown Vice Lords;
2) he occasionally sold drugs for Ted at a "spot" located on Springfield Street between Fillmore and Arlington Street in Chicago;
3) there was a battle between Ted and Willie Lloyd over which faction-controlled drug sales at that location;
4) a man selling drugs for Ted was robbed by Willie Lloyd and his men on September 12, 1993;
5) after that robbery, Ted promised Petitioner that if he helped him protect his spot, Petitioner would get a spot of his own to sell drugs;
6) in exchange for a permanent drug spot, Petitioner agreed to Ted's request that he help "get" Willie Lloyd's men;
7) Ted instructed Petitioner to get a gun and that he, Ted, and eight other men went looking for Willie Lloyd and his gang;
8) the group split up and later that evening, Ted and Baby Ty returned, saying that they had shot Willie Lloyd's chief enforcer, Clifford Burkes, or "Chub," that evening on Chicago Avenue;
9) Petitioner and others then checked into the Shamrock Hotel the night of September 12;
10) the next morning, September 13th, Ted and Baby Ty informed Petitioner and the other men that two of Willie Lloyd's "boys" took over and were selling drugs at Ted's spot, and said, "let's go get 'em;'"
11) Ted and Baby Ty left in a car and Petitioner and the rest of the men followed to the spot;
12) when they arrived, Ted and Baby Ty already had the two men, (i.e., Burch and Purham), in the back of their car;
13) Ted and Baby Ty took the Burch and Purham to an elevated spot near the railroad tracks on Roosevelt Street between Western Avenue and California Avenue where the other men followed;
14) When they arrived, Ted shot one of the guys in the head;
15) Petitioner and the other guys then began shooting at the other victim; and
16) he believed he shot the other victim in the leg.

## C. Suppression Hearing

In the midst of his defense, Petitioner filed a Motion to Suppress his written statement. At a suppression hearing on April 25, 1996, Petitioner testified that Detective Kato was never present for

3

questioning and that he did not recall speaking with ASA Nelson. Instead, Petitioner testified that he was questioned by Officer Cronin and that he only gave his statement after Officer Cronin physically threatened him by putting his foot on a chair between Petitioner's legs and shoving him. Petitioner also testified that Officer Cronin threatened his family. He finally testified that no one read the statement aloud to him and that the initials on the document were not his.

Detective Kato testified that he was in fact present for the statement and that Officer Cronin was not involved in any capacity. Officer Cronin then testified that he never spoke with Petitioner about the shootings and did not sit in on any statements. After hearing all the testimony and reviewing the evidence, the trial court denied Petitioner's Motion to Suppress his written statement.

### D. Trial

At trial, ASA Nelson further authenticated Petitioner's statement and read it aloud to the jury. Petitioner maintained that Officer Cronin was actually the individual who questioned him, that Officer Cronin physically threatened Petitioner, and that Officer Cronin forced Petitioner to tell ASA Nelson that he shot Burch in the leg. In rebuttal, the state called Officer Cronin who stated that he never spoke with defendant on the day he was arrested. The state then called Detective Kato who testified that he interviewed defendant and that Officer Cronin did not have any contact with him.

The state also called a forensic pathologist who testified that Burch's body had nine gunshot wounds, including one in the left thigh and another in the right thigh and that Purham's body had two gunshot wounds. The parties stipulated the .9-millimeter gun the police recovered from Petitioner at his arrest could have fired a .9-millimeter bullet recovered from Burch's clothing.

Finally, Petitioner called Barry Williams, also known as "Smurf" and Aaron Lamar, who testified that he was at the spot at the time Burch and Purham were taken off the street but did not remember Petitioner being present. The government then introduced Williams' grand jury statement

4

and statement to ASA Nelson on September 16, 1993, as prior inconsistent statements, since he identified Petitioner as one of the men present at the kidnapping in both.

After hearing all the evidence, the jury found Petitioner guilty of two counts of first-degree murder and two counts of aggravated kidnapping. Petitioner was sentenced to natural life imprisonment on the first-degree murder convictions.

### E. Direct Appeal and Postconviction Review

On direct appeal of his convictions, Petitioner raised three issues: (1) whether the trial court erred by denying Petitioner's Motion to Suppress; (2) whether the trial court improperly admitted evidence of other crimes, and (3) whether Petitioner's trial counsel was ineffective for failing to object to the admission of other crimes. The appellate Court rejected all of Petitioner's arguments and affirmed his conviction. Petitioner then filed a *pro se* petition for leave to appeal ("PLA") to the Illinois Supreme Court, which the court denied on December 5, 2002.

On February 27, 2012, with the assistance of counsel, Petitioner filed an amended petition raising a claim of actual innocence. Petitioner attached an affidavit from Eunice Clark, Barry Williams' girlfriend, signed on July 23, 2002, stating that she was present when Burch and Purham were kidnapped, that she did not see Petitioner, and that Williams gave untruthful testimony. Specifically, Clark's affidavit alleges Williams perjured himself in exchange for relocation money from the state attorney's office. Petitioner also attached an affidavit from Corey Campbell, with notes from a private detective's interview with Campbell and Campell's handwritten statement from February 13, 2012, which claimed that Campbell, Harvey, and Lil Donny were solely responsible for the murders. The State filed a motion to dismiss the petition. The circuit court denied the state's motion and advanced the petition for a third-stage evidentiary hearing on Petitioner's actual innocence claim.

After the evidentiary hearing, the court found that Campbell's testimony was not credible , as it conflicted with Petitioner's written statement, Clark's affidavit, and Williams' written statement, all

5

of which stated that the kidnapping and murder involved a group of men.  In its decision, the court also reiterated that Petitioner's written statement was voluntary and emphasized that the parties' stipulation that Petitioner possessed a .9-millimeter handgun at the time of his arrest, the same type of gun used to shoot Burch in the leg.  Petitioner renewed his innocence claim on postconviction appeal.  The Illinois Appellate Court affirmed the circuit court's ruling, deferring to the circuit court's credibility determinations and ruling that the court did not commit manifest error in denying the petition. Petitioner then renewed his claim in a PLA, which the Illinois Supreme Court denied on January 25, 2023.

### F.  Present Habeas Petition

On December 14, 2023, Petitioner timely filed the present § 2254 petition, alleging that he is actually innocent of the double kidnapping and murders.  Petitioner's actual innocence claim relies on Clark's statement that Williams had provided untruthful testimony at trial, asserts that the state was aware that Williams' testimony was untruthful, and references Clark and Campbell's affidavits as support for his petition.

### Legal Standard

A federal court cannot grant a petition for a writ of habeas corpus for "any claim that was adjudicated on the merits in state court proceedings." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). Thus, where the state court addressed Petitioner's claim on the merits, a federal court can only re-adjudicate a state court ruling when the state court's rejection of the claim was (1) contrary to, or an unreasonable application of, United States Supreme Court precedent under § 2254(d)(1); or (2) based on an unreasonable determination of facts under § 2254(d)(2). *Cullen v. Pinholster*, 563 U.S. 170, 185 & n.7 (2011).  A state court's refusal to consider evidence presented by the prisoner in a state court

proceeding can result in an unreasonable determination of fact under 2254(d)(2). *Lee v. Kink*, 922 F.3d 772, 775 (7th Cir. 2019).

**Discussion**

### A. Merits of *Napue* Claim and Procedural Default Analysis

Petitioner first seeks relief under *Napue v. Illinois*, arguing Williams' Testimony, which contributed to his conviction, was knowingly false. (Dkt. 1 at *8.) *Napue v. Illinois* held that the prosecution violates the Fourteenth Amendment's due process clause when it solicits or fails to correct testimony that the prosecution knows to be false. 360 U.S. 264, 269 (1959). It is an essential element of a *Napue* claim that the state knew the testimony to be false at the time of trial and that the testimony was material. *See Glossip v. Oklahoma*, 604 U.S. 226, 243-46 (2025).

In order to rule on the merits of Petitioner's *Napue* claim, the Court must also determine if it is precluded from hearing the case based on the procedural default doctrine. The procedural default doctrine will preclude a federal court from reaching the merits of a habeas claim when either (1) that claim was presented to the state courts and the state-court ruling against the petitioner rests on adequate and independent state-law procedural grounds, or (2) the claim was not presented to the state courts and it is clear that those courts would now hold the claim procedurally barred. *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004). Thus, when the habeas petitioner has failed to fairly present to the state courts the claim on which they seek relief in federal court and the opportunity to raise that claim in state court has passed, the petitioner has procedurally defaulted that claim. *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004).

This procedural default doctrine is, however, subject to equitable exceptions, including instances where a petitioner alleges they are ***actually innocent*** of the crime for which they were convicted—that is, that no reasonable juror would have found them guilty but for the error(s) allegedly committed by the state court. *Perruquet*, 390 F.3d at 514–15. To demonstrate "actual innocence,"

petitioners can invoke two kinds of claims— "actual innocence" as a gateway claim through which a habeas petitioner might pass so that a court can consider constitutional claims that were otherwise procedurally barred or "actual innocence" as a substantive matter. *Dixon v. Williams*, 93 F.4th 394, 402–03 (7th Cir. 2024). Where a petitioner makes both claims, as here, the Court begins with the gateway claim since that is what allows the court to even hear the claim prior to moving on to an individual's innocence as a substantive matter. *See id.* at 403-404. To pass through the threshold gateway, the petitioner must support the claim of actual innocence with "reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence— that was not presented at trial," all of which qualify as "new evidence." *Schlup v. Delo,* 513 U.S. 298, 324 (1995). "To demonstrate innocence so convincingly that no reasonable jury could convict, a prisoner must have documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim." *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005).

Petitioner argues he can maintain his *Napue* claim since Williams provided testimony that was "knowingly false," a fact that Williams admits to in an affidavit attached to Petitioner's post-conviction petition on May 30, 2012. (Dkt. 30 at *9.) Specifically, Williams' affidavit states that he initially identified Petitioner in exchange for relocation money. (Dkt. 21 at *10.) Petitioner argues the state should have been aware that Williams' testimony was false. (Dkt. 21 at *12.). As to any argument of procedural default, Petitioner argues the affidavits and testimony he provided to the court include "new evidence" that was not provided to the jury and that prove his "actual innocence," excusing any "procedural default to his *Napue* claim."

The state, by contrast, argues Petitioner does not present a viable *Napue* claim, even liberally construed. (Dkt. 15 at *12.) The state explains, an allegation that Williams knowingly gave false testimony does not state a claim for relief under *Napue*; a *Napue* claim requires an allegation (and proof)

8

that the prosecutor knew the testimony to be false. (*Id.*) (citing *Meyers v. Gomez*, 50 F.4th 628, 647 (7th Cir. 2022) ("[petitioner] must also show that the State knew (or should have known) that [a witness] was lying and nonetheless chose to present his false testimony at trial."). Because the petition does not allege any facts or proof that the prosecution knew Williams' testimony to be false, the state argues, Petitioner cannot state a claim. *See* (Dkt. 15 at *12.) More importantly, the state argues, because Petitioner never presented a *Napue* claim in state court, such a claim is procedurally defaulted. (*Id.* at *14.) While Petitioner supported his state postconviction petition with Clark's affidavit, which stated that Williams knew that his testimony was false, petitioner never alleged at any level of state review that the prosecutor knowingly introduced false testimony from Williams, nor did he cite *Napue* in support of his postconviction claims. (*Id.* at *13.)

Furthermore, the state argues that the Court should reject Petitioner's "actual innocence" argument because he has not met the "demanding standard for such equitable relief." Specifically, the state argues Petitioner's gateway actual innocence claim fails because neither Clark nor Campbell provide credible evidence of Petitioner's innocence. (*Id.* at *14.) Although Clark submitted an affidavit in support of Petitioner's postconviction petition, Petitioner's attorney did not present her testimony at the state court's evidentiary hearing on actual innocence—explaining that he had decided not to call her based on an interview conducted by the State's Attorney's conviction integrity unit— calling into question the strength and credibility of her testimony. *See* (Dkt. 15 at *14.) The state additionally emphasizes that her affidavit conflicts with testimony and affidavits she provided in the cases of other defendants convicted for these crimes. While Campbell did testify at the state court's evidentiary hearing, the postconviction trial court expressly found that he was not credible—a finding the state argues the Court should presume correct. (*Id.* at *15)(citing *Coleman v. Lemke*, 739 F.3d 342, 351 (7th Cir. 2014) (state court findings ... are presumed correct on federal habeas review, unless the petitioner rebuts those findings with clear and convincing evidence.)). Finally, the state argues that

Campbell's testimony is not strong enough to bring Petitioner through the actual innocence gateway because his statement conflicts with Petitioner's written statement, Clark's statement, and Williams' statement. (Dkt. 15 at *16.) (citing *Wilson v. Cromwell*, 69 F.4th 410, 422 (7th Cir. 2023) (holding petitioner did not clear actual innocence gateway where new witness provided testimony that was inconsistent with existing witness' accounts)).

Ultimately Petitioner's *Napue* claim fails on the merits and independently fails because it does not meet the standard to pass through the actual innocence gateway. As an initial matter, Petitioner's conclusive assertion that the state "should have known" Williams' testimony was false, absent any facts showing prosecution was aware of any falsity at the time at trial, does not suffice to state a *Napue* claim. Because Petitioner cannot prove the essential element that the state "knew the testimony to be false at the time of trial," his *Napue* claim cannot survive. *See Glossip*, 604 U.S. 226. Even if Petitioner had a viable *Napue* claim, he cannot show the requisite actual innocence to overcome his procedural default. "Any new evidence Petitioner presents to pass through the procedural gateway must be considered along with the existing evidentiary record." *Wilson*, 69 F.4th at 422. As the Seventh Circuit has stated, the Court must consider "all the evidence, both old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted at trial." *Id.* The Court cannot say the evidence Petitioner proffers to support his actual innocence claim is "so compelling and unequivocal" that no reasonable juror would have convicted Petitioner in the light of it; the "new" testimony merely adds additional voices to a highly complex, and often inculpatory, evidentiary record from nearly 30 years ago. *See id.* (holding that adding a new voice to an otherwise inculpatory evidentiary record likely would prevent reasonable jurors from placing significant reliance on the new evidence after only four years). Any exculpatory evidence Petitioner proffers must be considered along with the extensive evidentiary record which includes a written admission from Petitioner implicating himself in the crime, Williams' prior grand jury testimony, physical evidence, and the parties' stipulations that the bullet

found in Burch's clothing could have been fired from Petitioner's gun, among other evidence. Affidavits from witnesses who contradict their own prior, sworn statements and that are in conflict with each other, do not suffice to pass through the actual innocence gateway in light of the weight of inculpatory evidence presented at trial. Here, considering Clark's and Campbell's affidavits along with the trial evidence, the trier of fact would be left with a series of competing eyewitness accounts, the balance of which would strongly point to guilt. As such, Petitioner's gateway actual innocence claim, fails.

### B. Merits of Petitioner's Substantive Actual Innocence Claim

For purposes of completeness, the Court will analyze the merits of Petitioner's substantive actual innocence claim, which generally refers to a "truly persuasive demonstration of 'actual innocence' made after trial that would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *See Dixon v. Williams*, 93 F.4th 394 at 406 (citing *Herrera v. Collins*, 506 U.S. 390, 400 (1993)). The Supreme Court has never held that such a claim is cognizable, outside of the capital setting; the Supreme Court has surmised, however, that if it were to recognize such a claim, the new evidence would have to " 'unquestionably establish' innocence." *Dixon*, 93 F.4th 401. The standard of proof for substantive actual innocence claims is even more demanding than that for gateway actual innocence claims. *See Schlup*, 513 U.S. at 316 (noting that a petitioner trying to make a gateway claim of actual innocence need carry less of a burden than if claiming substantive actual innocence).

Even if a standalone actual innocence claim were viable, which the Court does not have indication to believe it is outside of the capital setting, because Petitioner does not meet the actual innocence gateway standard, he lacks anything close to the definitive or convincing evidence that the Supreme Court and Seventh Circuit require to maintain a substantive actual innocence claim. *See Hayes*, 403 F.3d at 938 (holding that substantive actual innocence claims require conclusive

11

"documentary, biological (DNA), or other powerful evidence" to survive); *also see Dixon*, 93 F.4th at 407 (holding the same). Because Petitioner cannot meet the lower standard for a gateway actual innocence claim, his substantive actual innocence claim, that requires a more demanding standard of proof, also fails.

**Certificate of Appealability**

Having issued rulings on the merits of Petitioner's claims, the Court now determines if it will issue Petitioner a Certificate of Appealability. A habeas petitioner does not have the absolute right to appeal a district court's denial of his habeas petition, rather, he must first request a certificate of appealability. *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003). A habeas petitioner is entitled to a certificate of appealability only if they can make a substantial showing of the denial of a constitutional right. *Id.* at 336; 28 U.S.C. § 2253(c)(2). Under this standard, a petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons sated in the Court's rulings herein, the Petitioner has not established that a reasonable jurist would disagree that his claims are procedurally defaulted and/or meritless. Accordingly, the Court declines to certify his issues for appeal under 28 U.S.C. § 2253(c)(2).

**Conclusion**

For these reasons, the Court denies Petitioner's petition for a writ of habeas corpus and declines to certify any issues for appeal.

IT IS SO ORDERED.

Date: 6/24/2026

Entered: _____

SHARON JOHNSON COLEMAN
United States District Judge

12